# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1465-19T2
     A-1467-19T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

  Plaintiff-Respondent,

v.

D.J. and E.M.G., Jr.,

  Defendants-Appellants,

and

R.N.-I.,

  Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.S.G.,
E.A.G., and D.M.J., minors.

_____

Argued November 19, 2020 – Decided December 4, 2020

Before Judges Haas and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0116-19.

Dianne Glenn, Designated Counsel, argued the cause for appellant D.J. (Joseph E. Krakora, Public Defender, attorney; Dianne Glenn, on the brief).

Daniel DiLella, Designated Counsel, argued the cause for appellant E.M.G., Jr. (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Daniel DiLella, on the briefs).

Julie B. Colonna, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Julie B. Colonna, on the brief).

Nancy P. Fratz, Assistant Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Nancy P. Fratz, of counsel and on the brief).

PER CURIAM

Defendants D.J. ("Diana")[1] and E.G. ("Edward") appeal from a November 20, 2019 judgment of guardianship terminating their parental rights to A.S.G.

---

[1] We use fictitious names to protect the privacy of the biological parents and the children.  R. 1:38-3(d)(12).

("Amy") and E.A.G. ("Elizabeth"), who were three and two years of age at the time of entry of the judgment.[2] We affirm.

Diana and Edward have a prior history with the Division of Child Protection and Permanency (Division). In 1999, Diana's parental rights to three older children were terminated and they were adopted by their paternal grandmother in 2002. In 2014, the Division received a referral indicating that Diana and her newborn, Dora, were evicted and homeless. The pair were living with Diana's friend. The Division provided baby supplies and a referral to the Board of Social Services, and ultimately closed its case.

In 2017, the Division received a referral from a hospital reporting that Diana had a high-risk pregnancy with Elizabeth requiring a caesarian section, but missed the scheduled delivery and appeared a week later. Diana was living with Edward at the time and Amy was just seventeen months old. Elizabeth was born healthy. The Division conducted a home visit and noted the family had inadequate sleeping provisions, clothing, and formula for the baby.

The Division also learned Edward had substantiated allegations of sexual abuse of minors in 1984 and 2008, and a September 29, 2006 judgment of

_____

[2] D.M.J. ("Dora") was dismissed from the litigation and placed with her biological father.

conviction for child endangerment. Regarding the 1984 incident, Edward told the Division he masturbated onto the child's leg but did not penetrate her, but later denied ever being charged and claimed he was out of the country at the time of the alleged incident. Edward pled guilty to the 2006 child endangerment offense and received three years' probation and time served. He claimed he entered the plea in order to be released from jail and denied he was a sex offender. Edward completely denied the 2008 allegation, which involved abuse of his sister.

Edward attended a psychosexual evaluation scheduled by the Division with Cassandra Hutchins, Psy.D. in July 2017. She concluded there was no evidence to support his denials of the prior history of sexual abuse. Dr. Hutchins opined the risk of Edward abusing an infant or toddler was "likely low" but noted there was a risk "as it pertains to his interactions with other children that he may come into close contact with" and recommended he be referred to sex offender therapy. The Division referred Edward for treatment, but he did not attend, claiming he was not a sexual offender.

In December 2017, Diana contacted her Division case worker and stated it was "'not safe' for her children or herself in the home" and requested removal of the children. When the worker arrived at the home, she observed a cast on

4

Diana's arm. Diana denied domestic violence and stated she was injured when she fell while running after her children. Although the Division offered Diana an opportunity to meet with a domestic violence liaison and parenting classes, she refused to engage in either service. During this time, Edward relocated to North Carolina, and claimed to be living with his wife and that he was no longer in a relationship with Diana.

In February 2018, Newark police arrested and incarcerated Diana and Edward due to an altercation in which she stabbed him in the eye and collar bone. Edward claimed the incident began as a verbal altercation, but when he returned to the residence the following day, Diana stabbed him during a physical altercation. He claimed the children were asleep upstairs during the fight and denied domestic violence or a history of domestic violence. However, Edward stated he was concerned for Dora's safety because Diana punched the child and slammed Amy down in a chair. Edward also said Diana used marijuana and cocaine. Diana claimed she stabbed Edward in self-defense because he assaulted her. Diana claimed she was angry with Edward because he was unfaithful and expressed her anger by throwing a microwave on the ground. She stated Amy and Elizabeth were in the kitchen and witnessed the incident and were crying. Diana stated Edward pushed her onto a couch and punched her

when she tried to call the police, grabbed the phone, and continued hitting her. She then grabbed a knife and swung at him three times as he ran out of the house.

The Division removed the children and placed them in a resource home. After Diana's release from incarceration, she was granted visitation beginning in March 2018, but was consistently late. Edward began his visitation in November 2018. The Division asked Diana to sign consent forms in order to perform health assessments for Amy and Elizabeth, but she refused.

In June 2018, the Division referred the parties to Alison Strasser Winston, Ph.D. for parenting capacity evaluations and psychological assessments. Diana denied domestic violence and stated she did not believe Edward sexually abused children. Edward gave inconsistent answers during the assessment and his test results showed he "failed to respond in an open and honest manner." Dr. Winston found Edward minimized the domestic violence in an attempt to expedite reunification of the children with Diana, and demonstrated no insight into his "history of anger management difficulties" and the impact of the domestic violence on the children. Edward denied the need for sexual offender treatment and stated he would not comply with the service. Although Edward "demonstrated adequate emotional attachments to his children," Dr. Winston found his refusal to comply with services concerning because it "prolonged the

suspension of his contact with his daughters." She concluded Edward's lack of involvement in the children's lives resulted in his lack of knowledge of their emotional and physical needs, and if he "feels overwhelmed by his parenting responsibilities, he is at risk of lashing out at them due to his anger issues." She concluded Edward's noncompliance with services rendered him "incapable of providing his children with a safe and stable environment."

Dr. Winston concluded Diana could not parent the children because her "inability to admit to the level of violence in her relationship . . . suggests that she is unable to protect her children and herself from harm." Dr. Winston also concluded it was "extremely troubling that [Diana] and [Edward] remain in a relationship" because it exposed the children to domestic violence. She found Diana lacked insight into the level of risk posed by Edward's history of sexual offenses. She concluded "[Diana's] tendency to defend [Edward] and to rationalize his behavior highlights her dependency on him . . . and . . . demonstrates her tendency to place her need to be in a relationship over her need to protect her children from harm." Although Dr. Winston found Diana "demonstrated adequate emotional attachments to her children . . . [she] demonstrates no remorse about the level of risk at which she had placed her

children as a result of her involvement in an abusive relationship with a convicted sexual offender."

Dr. Winston recommended couples counseling when the parties' counselors deemed it appropriate. She recommended Diana obtain housing for herself and the children and psychotherapy, psychiatric evaluation, domestic violence counseling, and parenting skills classes. She also recommended Edward attend sex offender treatment, anger management, batterer's intervention, psychotherapy, and parenting classes. The Division made referrals based on these recommendations, but neither Diana nor Edward complied. The Division also referred the parties to the Youth Development Clinic (YDC), but they attended inconsistently and were discharged from the program.

In July 2018, the parties failed to attend a five-month review meeting with the Division. In October 2018, Diana informed the Division she was attending substance abuse and mental health treatment at Team Management 2000. The Division provided Diana with a bus pass in order to attend treatment, but her attendance was inconsistent. The court ordered Edward to comply with services in August and November 2018, and February 2019, but he refused. As a result of the parties' failure to participate in services, the court approved the Division's

permanency plan of termination of parental rights followed by adoption in February 2019.

Despite their prior claims, Diana and Edward resumed living together and presented as a couple in April 2019. As a result, the Division referred them to parenting classes from April through July, but the parties did not attend. In June, the family began supervised visitation, but Diana was late to nearly all visitations. Diana's records from Team Management revealed all positive urine screens, including a July 2019 screen that was positive for alcohol, cocaine, and marijuana.

In July 2019, Elizabeth Stilwell, Psy.D. performed psychological and bonding evaluations. Her report explained she reviewed the Division's records, including court records and orders, prior evaluations, and treatment records. Dr. Stilwell also conducted behavioral observations of the parties and the children and an observation of Elizabeth and her resource parents. The third component of the evaluation included clinical interviews of the parties and psychological testing. Diana failed to complete the psychological testing, claiming she had to meet a social worker in a library to look up a "reference" and canceled her rescheduled evaluation despite the doctor informing her of the importance of the evaluation given the looming guardianship trial. Edward partially completed

the testing but "left an excessive number of items blank, despite being instructed to answer every question. As such, his protocol could not be scored."

Dr. Stilwell concluded Diana's "judgment and decision-making are significantly impaired" and Diana lacked "insight into why it was important for her to participate in the . . . evaluation." She also found Diana had not ameliorated the causes for the children's removal and the prognosis for her ability to parent or provide them with permanency was poor because of her failure to complete the services offered by the Division. Although Diana was engaged with the children during the bonding evaluation, Dr. Stilwell concluded "this does not suggest that she would be able to handle the stresses and demands of full-time parenting."

Dr. Stilwell found Edward's representations of the history of domestic violence and relationship with Diana "illogical and incomprehensible." Despite prior admissions to the contrary, he claimed Diana stabbed him while they were practicing marital arts as a family.[3] Dr. Stilwell noted

> the narratives that [Edward] has contrived are poorly formed and not well thought out. It is clear that [he] is intentionally trying to deceive the [c]ourt, [the Division], and the undersigned . . . . It appears that [Edward] is not interested in maintaining a relationship with [Diana]. He reports that while they technically

---

[3] Diana offered a similar narrative.

reside at the same residence, they never see each other
. . . and that he is questioning whether he even wants to
co-parent with her.

Dr. Stilwell concluded

[t]he totality of the data suggests that [Edward] presents
with numerous parenting deficits that would put any
child placed in his care at a risk of harm. There is a
significant risk for ongoing domestic violence between
[the parties] . . . . While [Edward] was determined to
be low-risk for offending against a biological child, his
risk to his daughter[]s as they mature . . . is moderate to
high . . . . Furthermore, [Edward] does not appear to
have a sufficient understanding of children's emotional
or developmental needs or the importance of caregiver
consistency and reliability. [He] interacted minimally
with the children during the bonding evaluation and
appeared to be annoyed that he had to attend an
appointment outside of their regularly scheduled visit.

Dr. Stilwell opined Elizabeth was securely attached to her resource

parents, who became her psychological parents and wished to adopt her. She

noted "[t]here is no evidence . . . that there is any other consistent and healthy

parental figure in [Elizabeth's] life . . . to mitigate the harm of being separated

from her psychological parents. [I]f [Elizabeth was] separated from her

psychological parents, she would suffer a traumatic loss that would produce

significant and enduring harm." Although Amy was not in a pre-adoptive

resource home, Dr. Stilwell concluded "it is unlikely that [Diana] and [Edward]

will become viable parenting options . . . in the foreseeable future . . . and . . .

11

[Amy should] be freed for adoption and have a chance at achieving permanency."

At trial, Dr. Stilwell testified consistently with her report. The Division also called an adoption worker and a supervising family service specialist assigned to the case. Neither Diana nor Edward testified or called witnesses. The trial judge issued an oral decision in which he found the Division had clearly and convincingly proven all four best interest prongs codified in N.J.S.A. 30:4C-15.1(a).

The judge recounted the parties' history with the Division and their failure to comply with any of the services offered. He also credited Dr. Stilwell's testimony, which he characterized as "comprehensive," "articulate," "very knowledgeable" and found he was an "extraordinarily credible witness."

The judge found the Division proved the first best interests prong because the children were exposed to domestic violence and physical abuse by their parents who failed to shield them from the harm. He found the children would continue to be harmed because both parents refused to cooperate with the Division and Diana and Edward had not "availed themselves of any therapy to help them better deal with their issues as parents." He noted Diana and Edward's failure to engage in services "deprived the children of their parents, of the

permanency that they deserve, of them being able to experience . . . a relationship between the children and their parents[.]"  The judge concluded because the parties were "presenting as a couple . . . that reunifying this couple would put the children at unjustifiable risk."

The judge found the Division proved the second prong because neither parent "is able to provide care for the children today, nor will they be able to do so in the foreseeable future."  The judge credited Dr. Stilwell's "unrebutted expert opinion . . . that . . . [Diana] is unlikely to . . . provide her children with permanency, as she is ill-equipped to handle the stresses that come with being parents to young children."  He also credited Dr. Stillwell's view that Edward "has not demonstrated any ability or indication that he is willing to be able to make himself fit to provide care for the children."  He noted Edward "obviously was convicted of endangering the welfare of a child."  The judge concluded "[n]either parent has presented the Division or the [c]ourt with a plan as to how they might care for these children if they were returned.  Their current housing status is unknown."

Citing Dr. Stilwell's unrebutted testimony, the judge found the Division proved Elizabeth "would suffer . . . irreparable harm if removed from her resource parents."  He concluded "[t]o deny [Amy] and [Elizabeth] permanency

A-1465-19T2

in the hope that [Edward] or [Diana] will be stable parents, in light of their histories, in light of the time that has expired since the last removal, is not in the . . . children's best interest."

The judge found the Division proved the third best interests prong. He credited the adoption worker's testimony, which he characterized as "candid" and explained "the extensive history of the Division's attempts to bring these parents into a position so that they might be able [to parent]." He stated:

> The Division has made the reasonable efforts to help [Diana] and [Edward] correct the circumstances that led to the removal.
>
> They tried providing over and over services to the family, psychological evaluations on more than one occasion, therapy sessions, substance abuse assessment, parenting skills, visitation, relative assessment, placement transportation service, family team meetings, domestic violence services, offers for sex offender treatment. And, despite all of these services being provided, neither parent is in a position to care for the children today, nor will they be able to do so in the near future.
>
> There are no alternatives to termination of parental rights. The Division has assessed several relatives . . . and many of them were just dead end streets, it was a name. They tried to get them to do it, they didn't provide anything, they were people who had other violations, they couldn't be licensed. . . . [T]he Division in this case did an awful lot of hard work to look for alternatives.

The judge found the Division proved the fourth prong and that a termination of parental rights would not do more harm than good to the children. He noted Elizabeth's "resource parents have unequivocally expressed a desire to adopt her and provide her with stability and permanency" whereas neither Diana nor Edward "could safely parent the child today, nor will they be able to in the future." Regarding Amy, the judge found as follows:

> I heard testimony today that, in fact, when a child is legally ready to be adopted, the chances in this instance of finding them an adoptive home is . . . much more likely.
>
> So, in this case, even without a specific home to name, I find that the Division has also proven by clear and convincing evidence that termination of parental rights, when it comes to [Amy], would do no more harm than good.

On appeal, both defendants challenge the trial judge's findings under all four best interests prongs. Diana argues as follows: 1) there was no evidence she harmed the children and the one incident of reported domestic violence did not affect the children because they are young and unaware; 2) she and Edward are no longer in a relationship and she is no longer reliant on him; 3) the court could not rely on the expert's testimony because Diana did not complete the psychological testing with the expert; 4) she can parent despite being occasionally overwhelmed; 5) the Division removed the children without

A-1465-19T2

consideration of Diana's pre-arranged plans for her family to care for them; 6) the Division failed to provide housing assistance and did not keep her apprised of the children's progress; 7) the Division offered inadequate visitation and impeded visitation; and 8) a termination of parental rights will do more harm than good because only Elizabeth is in an adoptive home while Amy is in foster care awaiting adoption, and an adoption by separate homes will terminate the sibling bond.

Edward argues the Division wrongfully concluded he was a sex offender and failed to review his criminal record and prior substantiations. He asserts he is not on the sex offender registry and not required to have treatment by virtue of his prior conviction, and maintained custody of his other children without incident. Edward claims the Division erroneously recommended he attend sex offender services he did not need, and when he failed to do so, it assumed he was an offender and denied him visits with the children. He argues because the services provided by the Division were predicated on an assumption he was a sex offender he did not receive appropriate services, which prevented reunification and affected visitation. Edward contends the physical altercation with Diana was caused by her post-partum depression and there is no history of domestic violence. He asserts the Division did not consider his plans to

financially support the family. He alleges adoption would do more harm than good because the judge did not consider the advanced age of Elizabeth's resource parents and that they have no plan of succession in the event of their demise while caring for a young child.

In reviewing the parties' challenges to the judge's decision, we must defer to his factual findings unless they "'went so wide of the mark that a mistake must have been made.'" N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (citation omitted). So long as "they are 'supported by adequate, substantial and credible evidence,'" a trial judge's factual findings will not be disturbed on appeal. In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (citation omitted). We owe special deference to the trial judge's expertise in handling family issues. Cesare v. Cesare, 154 N.J. 394, 411-13 (1998).

In striking a balance between a parent's constitutional rights and a child's fundamental needs, courts employ the four-part guardianship test articulated in N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 604-11 (1986) and codified as N.J.S.A. 30:4C-15.1(a), which states:

> The division shall initiate a petition to terminate parental rights on the grounds of the "best interests of the child" pursuant to subsection (c) of section 15 of

A-1465-19T2

P.L. 1951, c. 138 (C. 30:4C-15) if the following standards are met:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from [their] resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

In their application, the four factors above "'are not discrete and separate, but relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests.'" N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 606-07 (2007)).

Having reviewed the record, we conclude the judge's factual findings are based on sufficient credible evidence, and in light of those findings, his legal

conclusions are unassailable. The record amply supports his decision that a termination of Diana and Edward's parental rights is in the children's best interests. The defendants' arguments do not lead us to a different conclusion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1465-19T2